ESTATE OF RICHARD M. FEUER, DECEASED, MARGARET FEUER, EXECUTRIX, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of Feuer v. Commissioner
Docket Nos. 8366-75, 8367-75, 8368-75.
United States Tax Court
T.C. Memo 1978-309; 1978 Tax Ct. Memo LEXIS 203; 37 T.C.M. (CCH) 1287; T.C.M. (RIA) 78309; August 9, 1978, Filed Earl C. Crouter, for the petitioners in docket Nos. 8366-75 and 8367-75. John D. McGuire,William M. Walker,Richard B. Dodge, and Ronald L. Bauer, for the petitioners in docket No. 8368-75. Marion Malone, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions thereto as follows: Docket No. 8366-75 Estate of Richard M. Feuer, Deceased, Margaret Feuer, Executrix
Additions to Tax Taxable Year
Income Tax
I.R.C. 1954 [2] Ended
Deficiency
Sec. 6653(b)
1965
$ 481.85
$ 240.93
1966
6,677.62
3,338.81
1967
32,168.98
16,084.49
*204 Docket No. 8367-75 Margaret Feuer
Additions to Tax Taxable Year
Income Tax
I.R.C. 1954 Ended
Deficiency
Sec. 6653(a)
1966
$ 6,483.09
$ 324.15
1967
31,876.72
1,593.84
Docket No. 8368-75 Daniel J. Lengyel and Lois M. Lengyel
Additions to Tax Taxable Year
Income Tax
I.R.C. 1954 Ended
Deficiency
Sec. 6653(b)
1965
$ 968.07
$ 484.04
1966
14,738.62
7,369.31
1967
64,194.22
32,097.11
The issues for decision are: (1) Whether respondent's determination of deficiencies in the case of each petitioner for 1967 to the extent it is based on adjusted deposits in a partnership bank account which were not included in the gross receipts reported on the partnership return of income or in the reported income of the partners was so arbitrary as to cause the deficiencies determined in respondent's notice of deficiency for that year not to have a presumption of correctness; (2) the proper amount of income of a partnership composed of Richard Feuer and Daniel Lengyel for each of the years 1965, 1966 and *205 1967; (3) the amount of partnership income distributable to Richard Feuer which was not reported on his or his wife's separate Federal income tax return for each of the years 1965, 1966 and 1967; (4) the amount of partnership income distributable to Daniel Lengyel which was not reported on the joint Federal income tax return of Mr. and Mrs. Lengyel for each of the years 1965, 1966 and 1967; (5) whether a part of the underpayment of tax resulting from the understatement of income on the separate tax return of Richard Feuer for each of the years 1965, 1966 and 1967 was due to fraud; [3] and (6) whether part of the underpayment of tax resulting from the understatement of income on the separate tax return of Margaret Feuer for each of the years 1966 and 1967 was due to negligence or intentional disregard of rules and regulations. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time of the *206 filing of the petition in this case Margaret Feuer, who is one of the petitioners and also the executrix of the estate of Richard M. Feuer, resided in Los Angeles County, California. During the taxable years 1965, 1966 and 1967, Richard and Margaret Feuer were married and lived in Tujunga, California. They each filed a separate individual Federal income tax return for each of those years on the cash basis of accounting. Daniel J. and Lois M. Lengyel, husband and wife, whose legal residence at the time of the filing of their petition in this case was Fountain Valley, California, filed a joint Federal income tax return for each of the years 1965, 1966 and 1967 on the cash basis of accounting. In September 1965, Richard Feuer and Daniel Lengyel entered into a partnership agreement to conduct the business of buying and selling lathes and other new and used machines and machine tools. The partnership business was conducted under the name of Daniel-Richards and Marlowe Machinery Exchange and its place of business was located on South Santa Fe Avenue, Los Angeles, California. The partnership commenced doing business as of July 27, 1965, and the partnership agreement, although entered *207 into in September, provided that it was effective as of that date. The partnership agreement provided that each partner would give equal time to the business and that profits and losses would be shared equally. The agreement provided that if one of the partners was not devoting full time to the business, the other partner would receive a salary from the partnership of $ 200 per week. Prior to the commencement of the partnership business Mr. Lengyel had been employed by Aaron Machinery Company (Aaron), his final employment being as manager of that company. Aaron was engaged in the sale of machinery at the South Santa Fe address which was later the business location of the partnership. During 1965, Aaron was in receivership and Mr. Lengyel was offered the opportunity of purchasing the assets consisting primarily of inventory for $ 140,000 with $ 15,000 cash downpayment and the balance to be paid from 60 percent of the proceeds from the sale of the machines which were in inventory. Mr. Lengyel did not have sufficient funds to make the $ 15,000 downpayment required for the purchase. He therefore approached Mr. Feuer about entering into a partnership with him. The partnership was *208 to commence business with the purchase of the Aron assets. Mr. Lengyel had known Mr. Feuer for some years and at the time they entered into the partnership agreement Mr. Lengyel was renting his home from Mr. Feuer. Mr. Feuer at the time was employed as a linotype operator. When Mr. Lengyel and Mr. Feuer agreed to enter into the partnership, Mr. Lengyel was actually working at the South Santa Fe Avenue address for Aaron. When the partnership commenced business on July 27, 1965, he continued to work at that Santa Fe address in connection with the partnership business and worked there for the partnership until September 12, 1967. Mr. Feuer left his job as a linotype operator in November 1965 and at that time came to work with the partnership at the South Santa Fe Avenue address on a full-time basis. Thereafter, Mr. Lengyel and Mr. Feuer both worked on a full-time basis for the partnership and were the only salesmen for the partnership. The partnership in 1965 and 1966 had a number of employees who worked as mechanics and maintenance helpers. In 1967 the number of employees decreased and by August the partnership had only one employee. In late 1965 or early 1966 the partnership *209 began importing new machines from Italy. The partnership was the exclusive distributor for the western United States of an Italian machine known as the Induma Milling Machine. The partnership also had another line of imported machines known as Breda Lathes but distributed these machines on a nonexclusive basis. Beginning in 1965 the partnership would order about four Induma machines a month. The number of machines ordered a month increased and by 1967 the partnership was ordering 16 Induma machines a month. The partnership maintained a set of double entry books. This record-keeping system had been set up for the partnership by a CPA, Theodore Anderson. Mr. Anderson reviewed the books and records of the partnership monthly and reconciled the sales records and sales invoices furnished him with deposits in the bank account of the partnership. He also kept a record of the partnership inventory, although he never took a physical inventory, and charged out of inventory the machines sold each month and added into inventory the machines ordered. The partnership books were kept on an accrual basis of accounting. Generally someone from the partnership would take the partnership records *210 each month to Mr. Anderson and would pick these records up after Mr. Anderson had completed his work. At the time Mr. Anderson set up a bookkeeping system for the partnership he instructed Mr. Lengyel and Mr. Feuer to deposit all receipts from sales in the partnership bank account and to pay all expenses by checks drawn on that account. As part of his monthly review of the books and records of the partnership Mr. Anderson posted the partnership expenses as disclosed by the partnership checks and notations on the check stubs to the various expense accounts set forth on the partnership ledgers. Serial numbers were shown in the inventory for each machine. When a machine was purchased it would be placed in inventory by its number, and when a machine was sold the number of the machine would appear on the sales invoice so that Mr. Anderson would be able to remove this machine from inventory. The invoices from which Mr. Anderson worked in keeping the partnership books were pre-numbered invoices. He never saw the deposit slips for the deposits into the partnership bank account but reconciled the net deposits to the sales invoices he was shown. At the commencement of its business, the *211 partnership opened a checking account, No. X5-948, at the Valley National Bank in South Glendale. The account was carried under the partnership name and both Mr. Lengyel and Mr. Feuer signed the signature card for the account and each was authorized to sign checks on this account. The last deposit in this account was made on February 4, 1966, and the account was closed on April 1, 1966. On February 11, 1966, the partnership opened a checking account, No. XX2081, at the Bank of America, Vernon Branch. This account was in the partnership name and both Mr. Lengyel and Mr. Feuer signed the signature card and each was authorized to sign checks on the account. This partnership account was maintained until February 14, 1967, at which time it was closed by a transfer of the account to the Bank of America, Bell Branch. The partnership checking account opened at the Bell Branch of the Bank of America on February 16, 1967, carried No. XX0013 and this account was also under the partnership name. The signature card for this account was also signed by each Mr. Lengyel and Mr. Feuer and each of them was authorized to sign checks on the account. The partnership account at the Bell Branch *212 of the Bank of America was closed on January 3, 1968, but all activity ceased in this account on August 24, 1967. The three bank accounts above-described, namely the partnership checking account in the Valley National Bank in Glendale, the partnership checking account at the Bank of America, Vernon Branch, and the partnership checking account at the Bank of America, Bell Branch, were the only bank accounts of the partnership of which Mr. Anderson had any knowledge or checked in any way with the partnership records. However, in addition to these checking accounts Mr. Lengyel and Mr. Feuer had three joint accounts. One of these accounts was a joint savings account, No.0005397, at the Valley National Bank, South Glendale, which was opened September 17, 1965, and closed on April 1, 1966. Another of the joint accounts of Mr. Feuer and Mr. Lengyel was a checking account, No. X8-678, at the Valley National Bank, South Glendale. This account was opened on December 31, 1965, and closed on February 28, 1966. The third of the joint accounts of Mr. Lengyel and Mr. Feuer was a savings account, No. X-5284, at the Bank of America, Vernon Branch, which was opened on December 2, 1965, and closed *213 on March 3, 1967. In addition to these three joint accounts of Mr. Lengyel and Mr. Feuer, the partnership maintained in its name a checking account, No. XX5718 at the Crocker Citizens Bank, Vernon Branch, which was opened on March 20, 1967, and closed on October 24, 1967. Mr. Lengyel and Mr. Feuer each signed the signature card and each was authorized to draw checks on this account. Soon after commencement of the partnership business Mr. Lengyel and Mr. Feuer began a regular practice of withholding cash from the checks given to the partnership in payment for machines when the deposits were made in the bank accounts of the partnership which were known to their accountant, Mr. Anderson. In order that the books maintained by Mr. Anderson could be checked and would balance, Mr. Lengyel and Mr. Feuer used a double set of invoices. The set which was given to Mr. Anderson would show a sales price for a machine that conformed to the amount received from the sale of that machine which was deposited in the partnership bank account that was furnished to Mr. Anderson. The other set of invoices would show a higher sales price than shown on the invoice furnished to Mr. Anderson. This set *214 of invoices showed the actual sales price charged the customer for the machine and it was this invoice which was supplied to the customer. Net cash of $ 3,350, [4] $ 102,214.91 and $ 15,805.40 was withheld from checks deposited in the bank accounts of the partnership which were furnished to Mr. Anderson. [5] In addition, the amounts of $ 7,041.17 and $ 108.15 of partnership funds were deposited in accounts of Mr. Lengyel and Mr. Feuer other than partnership accounts during the years 1965 and 1966. Receipts from sales of machines by the partnership in the amounts of $ 15,923.60 and $ 2,605 for the years 1966 and 1967, respectively, were not deposited in any bank account. During 1967 total deposits were made in the account in the name of the partnership at the Crocker Citizens Bank of $ 441,610.63. A total amount of $ 144,293.43 was transferred during 1967 from the Crocker Citizens Bank account to the partnership account at the Bank of America, Bell Branch, which was the partnership account Mr. Anderson used in keeping the partnership books. A personal check of Mr. Feuer in the amount of $ 7,000 was deposited in the Crocker Citizens Bank account of the partnership and cashier's checks *215 and currency totaling $ 3,226.28 were deposited in this account. When these amounts are subtracted from the total deposits in the Crocker Citizens Bank account, the remaining figure is $ 287,090.92. Included in the deposits in the Crocker Citizens Bank account was $ 62,113.98 of receipts received by the partnership from machines purchased from it by Hicks Machinery Company. *216 The source of the remaining deposits in the Crocker Citizens Bank account is undisclosed in the record. Deposits in the Crocker Citizens Bank account were principally made by Mr. Feuer and most of the checks drawn on this account were drawn by Mr. Feuer. Also, beginning about the middle of March 1967 Mr. Feuer made most of the deposits to the partnership account at the Bank of America, Bell Branch, and drew most of the checks on this account. The reason the partnership bank account had been moved from the Valley National Bank in South Glendale to the Bank of America, Vernon Branch, on February 11, 1966, was that an official of the Valley National Bank objected to the withholding of cash from partnership checks deposited to the account. A similar objection by an official of the Vernon Branch of the Bank of America caused the partnership to transfer its account to the Bell Branch of the Bank of America on February 14, 1967. Around the middle of March 1967 Mr. Lengyel and Mr. Feuer discussed the possible dissolution of their partnership. Mr. Feuer at around this time or within several months thereafter approached an individual who ran a used machinery sales business with respect *217 to the possibility of that individual joining him in a machinery sales business. It was around this same time that a question had arisen with the manufacturers of the Induma Milling Machine as to whether the distributorship of those machines would be taken away from the partnership. The manufacturers of the Induma Milling Machine had suggested a markup over the machine's cost, including freight and import duties and other related shipping costs, of approximately 22 percent.Mr. Lengyel and Mr. Feuer, however, had considered this markup too small and almost from the time they commenced selling the machine had used a greater markup. When the partnership first began selling the Induma Milling Machine, the cost to the partnership of each basic machine, including freight and duty, was between $ 1,700 and $ 1,800. The partnership sold the machine to individuals for $ 2,700. Later the sales price of the machine was increased. Usually on a sale to a machinery dealer a 10 percent discount would be given. When the partnership purchased the Aaron inventory in July 1965, Mr. Lengyel contemplated selling the machinery purchased for a 50 percent markup. Some of the machines purchased from Aaron *218 were new machines and some were used machines. During the years 1965, 1966 and 1967 machinery of the type sold by the partnership was in scarce supply and at times to get a particular type of machine a customer would have to wait a year to 18 months. During this period of time new and used machinery would be marked up by some businesses engaged in selling machinery from 25 to 45 percent over cost. While the markup of used machinery could vary from a very low amount to 200 percent, a used machinery dealer who was located in the general area in which the partnership operations were conducted generally maintained an average of at least a 35 percent markup on used machinery. After Mr. Lengyel and Mr. Feuer had discussed the discontinuation of their partnership, the manufacturer of the Induma machines stopped sales of such machines to either Mr. Feuer or Mr. Lengyel. Mr. Lengyel commenced an individual business of selling machines in late September 1967 under the name of Lengyel Machinery Company.
In order to pay for machines ordered from foreign sources the partnership would arrange for a letter of credit, generally through one of the banks at which the partnership accounts known *219 to Mr. Anderson were carried. When the machines were to be shipped, the foreign producer would draw against this letter of credit and the partnership would then pay the bank which had made the arrangement for the letter of credit on the promissory note given to the bank at the time the arrangements for the letter of credit were made. Certain machines ordered on letters of credit arranged for in February by Mr. Lengyel for the partnership, which were shipped in late February or early March 1967, were not received by the partnership until June 1967 because of difficulties encountered by the ship carrying the machines. From th inception of the partnership until approximately the middle of March most of the letters of credit for purchases of foreign machines had been arranged for by Mr. Lengyel. On March 13, 1967, Mr. Feuer signed an application for a letter of credit for the partnership which was presented to the Valley National Bank, which bank arranged to have the letter of credit issued by the United California Bank. Machinery was purchased in Italy with this letter of credit and imported into the United States, the name of the importer being shown as the partnership at its South *220 Santa Fe Avenue address. The machine was shipped on March 24, 1967, and the date of importation was April 26, 1967. To finance the purchase of the letter of credit Mr. Feuer made a loan from the Valley National Bank in the amount of $ 23,018.22 and on May 11, 1967, paid this loan, together with interest, the total amount being $ 23,107.73, by a check dated May 11, 1967, drawn on the Crocker Citizens Bank. On April 18, 1967, Mr. Feuer applied, in the name of the partnership, through the Valley National Bank for a letter of credit for importation of machinery from Italy, which letter of credit was issued by the United California Bank.The machinery covered by this letter of credit was imported from Italy. It was shipped on April 22, 1967, and received in Los Angeles on May 25, 1967. The importer and person to receive the machinery was shown as the partnership at its South Santa Fe Avenue address. Mr. Feuer made a loan in connection with the negotiation of this letter of credit from the Valley National Bank and in payment of the loan, together with interest, Mr. Feuer drew a check dated July 7, 1967, in the amount of $ 23,211.42 on the partnership account in the Crocker Citizens *221 Bank. On May 1, 1967, Mr. Feuer applied to the Valley National Bank for a letter of credit on behalf of the partnership which was issued by the United California Bank. Machinery paid for by this letter of credit was shipped from Italy on May 20, 1967, to the partnership at its South Santa Fe Avenue address and its date of importation is shown as June 20, 1967. On June 16, 1967, Mr. Feuer drew a check in the amount of $ 23,048.34 on the partnership account in the Crocker Citizens Bank in payment of the loan, together with interest, made to him by the Valley National Bank to pay for the letter of credit. Mr. Feuer, on June 7, 1967, applied on behalf of the partnership for a letter of credit to the Valley National Bank which arranged for the letter to be issued by the United California Bank. Machinery covered by this letter of credit was shipped to the partnership.The total cost of this letter of credit came to $ 7,449.61.The loan from the Valley National Bank to finance this letter of credit was paid by Mr. Feuer on August 29, 1967. Numerous checks were drawn on the Crocker Citizens Bank account of the partnership. A number of these checks are in even amounts, but in addition *222 to the three checks in excess of $ 23,000 each drawn to repay letter of credit loans there are over $ 56,000 of checks in odd amounts ranging from $ 4.70 up to $ 7,680.38 drawn on the Crocker Citizens Bank account. Also, this account shows that in a number of instances two checks of an even amount cleared the account during the same week. On April 24, two checks in the amount of $ 2,200 each cleared this account. On May 5, a check for $ 1,250 cleared the account and on May 9, another check for $ 1,250 cleared this account. On August 25, a check for $ 2,200 cleared the account and on August 28, another check for $ 2,200 cleared the account.On September 18, a check for $ 5,000 cleared the account and on September 29, another check for $ 5,000 cleared the account. The partnership returns of income for the years 1965, 1966 and 1967 which were prepared by Mr. Anderson from the books furnished him by the partners show the following: July 27 to
Jan. 1 to
Jan. 1 to
Dec. 31, 1965
Dec. 31, 1966
Sept. 12, 1967
Gross Receipts
$ 110,084.50
$ 420,283.82
$ 312,654.68
Less Cost of
Goods Sold [1]
66,393.21
346,763.85
270,481.34
Gross Profit
43,691.29
73,519.97
42,173.34
Other Income
0
3,200.00
57.13
Total Income
43,691.29
76,719.97
42,230.47
Total Deduction
21,554.47
57,289.30
34,202.91
Ordinary Income
$ 22,136.82
$ 19,430.67
$ 8,027.56
*223 During 1965 and 1966 Mr. Lengyel and Mr. Feuer split 50-50 the cash withheld from sales of machinery when bank deposits were made.Mr. Lengyel had a safe at home in which he kept, during 1965 and 1966, most of his part of the cash. In 1967 Mr. Lengyel purchased over $ 52,000 worth of municipal bonds. On August 3, 1967, he deposited currency of $ 30,000 to his personal account at the Vernon Branch of the Bank of America and on August 29, 1967, deposited currency of $ 26,000 to this account.on September 11, 1967, Mr. Lengyel opened an account for Lengyel's Machinery Company at the Bank of America, Vernon Branch, with a deposit of $ 1,070.25. On October 2, 1967, $ 9,000 was deposited to this account and on October 27, 1967, $ 20,000. The $ 9,000 was a currency deposit. On October 14, 1966, Mr. Lengyel purchased four $ 5,000 Bank of America cashier's checks for a total of $ 20,000 and *224 on April 7, 1967, purchased two $ 5,000 cashier's checks for a total of $ 10,000. After the partnership ceased operations at its South Santa Fe Avenue address, Mr. Feuer and Mr. Lengyel were sued for failure to pay rent until the termination of the lease in July 1968. In settlement of this suit each of them paid $ 2,000 to the lessor. For the years 1969 and 1970 Mr. and Mrs. Lengyel reported on their Federal income tax returns that $ 49,131.18 had been set aside by the partners in the Daniel-Richards and Marlowe partnership as a reserve for certain contracts for the years 1966 and 1967 on which the partners were liable in case of the repossession of machinery. The Lengyels on their 1969 return reported that $ 29,131.18, of which one-half was Mr. Lengyel's, would no longer be needed in 1969, and on their 1970 return reported the remaining $ 20,000 was no longer needed. On this basis, Mr. and Mrs. Lengyel reported $ 14,565.59 of income from this reserve on their 1969 return and $ 10,000 on their 1970 return. In the early part of March 1968 a revenue agent was assigned to investigate the partnership returns of the Daniel-Richards and Marlowe partnership and the individual returns *225 of Mr. and Mrs. Lengyel and Mr. and Mrs. Feuer. About March 22, 1968, the agent telephoned Mr. Lengyel and asked to make arrangements to see the books and records of the partnership. Mr. Lengyel told the agent that his attorney had the records due to the dissolution of the partnership and that his attorney would contact the revenue agent. Later on the same day the agent called Mr. Feuer who stated that Mr. Lengyel had the records but that the Lengyels had moved from place to place and probably could not find the records. Mr. Feuer inquired of the revenue agent what would be the consequences of no records and was informed that in such event income and expenses would be reconstructed from third party sources. Mr. Fuer asked the agent whether this was a regular audit and "What's wrong." Mr. Feuer told the revenue agent that the 1967 partnership return was prepared but not filed. The revenue agent made several other attempts to obtain the partnersip records and was told by Mr. Lengyel that Mr. Feuer had the records and later was told by Mr. Lengyel that the records had been inadvertently destroyed. Mr. Lengyel also asked the agent "What's wrong." During one of the telephone conversations *226 the agent had with Mr. Lengyel, Mr. Lengyel told the agent that the 1967 partnership return was prepared but not filed. [6] During that interview Mr. Lengyel said that his wife had inadvertently thrown out the partnership records while cleaning out a closet. The partnership records were never made available for examination by any of the investigating officers of the Internal Revenue Service. During their interview with the revenue agent Mr. Feuer and Mr. Lengyel each told the agent that all partnership receipts were deposited in the partnership account at the Bank of America and that all partnership expenses were paid from that account. They each stated that no partnership receipts were deposited in his personal account. Mrs. Feuer was not an active participant in the partnership business. However, on occasions she would pick up the partnership records to take to Mr. Anderson or pick them up from Mr. Anderson for the partnership. She occasionally ran errands for the partnership *227 and also made bank deposits. She cashed one check for $ 3,500, which check had been received by the partnership in payment for a machine sold to C.M.R. Engineering in July 1966. On July 15, 1966, she made a deposit to the partnership account at the Bank of America, Vernon Branch. The deposit was of a check made to the partnership for $ 700 from which the amount of $ 400 in cash was withheld. After the revenue agent was unable to obtain any books of the partnership, he proceeded to attempt to reconstruct partnership income from the partnership bank accounts. He obtained records of the various bank accounts of the partnership and of Mr. Feuer and Mr. Lengyel and began an analysis of those accounts. In October 1968 the revenue agent referred the investigation to the Intelligence Division of the Revenue Service. During the course of the investigation respondent's agents circularized various customers of the partnership to obtain records of their transactions with the partnership. When the Crocker Citizens Bank account was first examined by a revenue agent, the bank had available microfilms of checks but these microfilms were destroyed in November of 1972 in line with the general *228 destruction policy of the bank. After the special agent came into the case in late 1968, Mr. Feuer and Mr. Lengyel obtained legal counsel and no agent of respondent had any further interviews or contacts with either of them. Mr. Feuer died on September 2, 1970, from a self-inflicted gunshot wound to the head. A Federal Grand Jury at Los Angeles returned two indictments against Mr. Lengyel on March 28, 1972. Mr. Lengyel signed the partnership returns for each of the years 1965, 1966 and 1967. On the 1967 partnership return of income, immediately above the partnership name appears the following: "Final Return -- Dissolved 9/12/67." On this return, under "Partners' Shares of Income, Credits and Deductions," Mr. Lengyel and Mr. Feuer are listed as the partners and each of them is stated to have devoted "all" of his time to the business and the division of the reported partnership profit is equal. On their joint Federal income tax return for 1965 Mr. and Mrs. Lengyel reported total income of $ 15,332.38 of which $ 4,250 was wages and $ 11,068.41 was distributable income from the partnership. On their 1966 joint Federal income tax return the Lengyels reported total income of *229 $ 9,886.83 of which $ 9,715.33 was distributable income from the partnership. On their joint Federal income tax return for 1967 the Lengyels reported total income of $ 3,858.70 which was arrived at by subtracting from reported distributable partnership income of $ 4,013.78 a business loss of $ 365.41 and adding thereto $ 210.33 of reported interest income. Mr. Feuer, on his separate returns for 1965, 1966 and 1967, reported total income of $ 6,231.18, $ 4,269.21 and $ 4,234.91, respectively. In arriving at the total income reported Mr. Feuer included reported partnership distributable income of $ 5,534.21, $ 4,857.54 and $ 2,006.89 for the years 1965, 1966 and 1967, respectively. These returns reported certain capital losses and a small amount of interest income. Mrs. Feuer reported on her returns for 1965, 1966 and 1967 identical amounts of income from identical sources as reported by Mr. Feuer. Mr. Anderson prepared the joint Federal income tax returns of Mr. and Mrs. Lengyel and the separate Federal income tax returns of Mr. Feuer and Mrs. Feuer for each of the years 1965, 1966 and 1967. Mr. Feuer's 1967 Federal income tax return was signed by him under date of April 14, 1968. *230 Mr. Lengyel signed the 1967 joint Federal income tax return which he filed with his wife under date of April 11, 1968. Respondent in his notice of deficiency to Mr. and Mrs. Lengyel and to each Mr. Feuer and Mrs. Feuer determined that the income of the Daniel-Richards and Marlowe partnership for 1965, 1966 and 1967 had been understated by $ 10,829.17, $ 118,246.66 and $ 305,501.32, respectively. This understatement of income was explained as consisting of the following items: 1965
1966
1967
Net cash withheld from
disclosed deposits
$ 3,788.00
$ 102,214.91
$ 15,805.40
Undisclosed deposits
(adjusted)
7,041.17
108.15
287,090.92
Receipts not deposited
15,923.60
2,605.00
Total additional
receipts
$ 10,829.17
$ 118,246.66
$ 305,501.32
Distribution to Partners Ordinary Income
1965
1966
1967
Daniel J. Lengyel
$ 16,483.00
$ 68,838.67
$ 156,764.44
Richard Feuer
16,482.99
68,838.66
156,764.44
$ 32,965.99
$ 137,677.33
$ 313,528.88
In his notice to the Lengyels respondent increased their reported income for each of the years 1965, 1966 and 1967 by one-half of the amount he determined to be the understatement *231 of partnership income. Respondent also determined that a part of the underpayment of tax resulting from this understatement of income by the Lengyels was due to fraud and therefore determined an addition to tax under section 6653(b). Respondent in his notice of deficiency to Mr. Feuer determined that his reported income was understated for each of the years 1965, 1966 and 1967 by one-quarter of the amount he determined to be the understatement of the partnership income for such year.In the notice to Mr. Feuer, respondent determined that a part of the underpayment of tax resulting from this understatement of income for each year was due to fraud and determined an addition to tax under section 6653(b). In his notice of deficiency to Mrs. Feuer, respondent increased her reported income for each of the years 1966 and 1967 by one-quarter of the amount by which he determined that the partnership income had been understated for that year. Respondent determined that a part of the underpayment of tax resulting from this understatement of income for each of the years 1966 and 1967 was due to negligence or intentional disregard of rules and regulations and therefore determined an addition *232 to tax under section 6653(a). OPINION All the issues here are factual. The position of all petitioners is that respondent's determination of deficiencies for the year 1967, based on undisclosed and unreported bank deposits in a partnership bank account, is so arbitrary as to take away any presumption of correctness which might otherwise attach thereto. Petitioners primarily rely on Helvering v. Taylor,293 U.S. 507 (1935), and Cohen v. Commissioner,266 F.2d 5 (9th Cir. 1959), remanding a Memorandum Opinion of this Court. In Helvering v. Taylor,supra, the Supreme Court held that where a determination by the Commissioner is shown to be arbitrary and "without rational foundation and excessive" the statute does not require a taxpayer to pay such excessive determinations unless he proves he owes nothing or, if liable at all, shows the correct amount he owes. The Court pointed out that the burden is on the taxpayer to show that the Commissioner's determination is invalid, and then stated: Frequently, if not quite generally, *233 evidence adequate to overthrow the Commissioner's finding is also sufficient to show the correct amount, if any, that is due. * * * But, where as in this case, the taxpayer's evidence shows the Commissioner's determination to be arbitrary and excessive, it may not reasonably be held that he is bound to pay a tax that confessedly he does not owe, unless his evidence was sufficient also to establish the correct amount that lawfully might be charged against him. On the facts shown by the taxpayer in this case, the Board should have held the apportionment arbitrary and the Commissioner's determination invalid. Then, upon appropriate application that further hearing be had, it should have heard evidence to show whether a fair apportionment might be made and, if so, the correct amount of the tax. * * * The evidence here shows that petitioners furnished no books and records to any of respondent's agents. Petitioners inquired of the revenue agent what would be the outcome of failing to supply him with books and records, and were told that under such circumstances he would attempt to determine the tax they owed from other sources.The determination of income by use of bank deposits adjusted *234 for ascertainable non-income items where taxpayers do not supply respondent's agents with books and records is not arbitrary. This has been held on numerous occasions. See Estate of Mason v. Commissioner,64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977), and cases there cited. Petitioners here make much of the fact that the agent should have determined what portion, if any, of the checks drawn on the account at the Crocker Citizens Bank were for expenses of the partnership. In our view it was not arbitrary for the agent in the absence of any records of the partnership to assume that the partnership expenses were all claimed on the return and only adjust the bank deposits for transfers and items deposited that were not considered by him to be partnership receipts. Estate of Mason v. Commissioner,supra at 658. While, as we will discuss subsequently, in our view some expenses of the partnership for cost of the items sold were paid from the Crocker Citizens Bank account and did not get into cost of goods sold as shown on the return, we do not consider respondent's assumption to the contrary in the notice of deficency *235 to be arbitrary or without rational foundation. Harper v. Commissioner,54 T.C. 1121, 1129 (1970). Therefore, this case is totally different from Helvering v. Taylor,supra, and that case has no application here. The case of Cohen v. Commissioner,supra, deals primarily with the problem of burden of proof and burden of going forward with evidence. The court in that case held that where a taxpayer has met his burden of showing the Commissioner's determination invalid, the presumption of correctness which attaches to the deficiency notice disappears and it is incumbent on the Commissioner to go forward with the proof. The court in Cohen v. Commissioner,supra, stated with respect to the determination necessary in such a situation: We neither state nor imply that the Tax Court's redetermination must be predicated upon precisely established income and expense figures. Since Cohan v. Commissioner, 2 Cir., 39 F.2d 540, it has been the recognized rule that absolute certainty is not required. *236 It is sufficient if the Tax Court makes as close an approximation as it reasonably can. The Tax Court's permissible leeway in this regard is the same as that which the Commissioner originally had. See Bodoglau v. Commissioner, 7 Cir., 230 F.2d 336, 340.
In the instant case the stipulated evidence shows that certain payments for machines were made from the Crocker Citizens Bank account and the evidence strongly indicates that the cost of these machines did not get into the cost of goods sold as reported on the partnership return of income. In our view such a showing does not render the Commissioner's determination invalid. See Harper v. Commissioner,supra.
Also, in our view the record in this case is sufficient to make a reasonable approximation of the total payments of partnership costs out of the Crocker Citizens Bank so that a determination of the amount of payments of costs from the funds deposited in the Crocker Citizens Bank account can be made on the basis of the evidence introduced at the trial without reference to the presumption attaching to respondent's determination. See American Pipe and Steel Corp. v. Commissioner,243 F.2d 125, 126 *237 (9th Cir., 1957), affg. 25 T.C. 351 (1955), cert. denied 355 U.S. 906 (1957). Later in this opinion we will discuss the evidence in this case from which a reasonable approximation of the amount of partnership expenses paid from the Crocker Citizens Bank account can be made. The checks drawn on the Crocker Citizens Bank were records of petitioners and if the originals had been destroyed, which testimony we do not accept, the microfilms were equally available at the bank to petitioners as they were to respondent's agents. However, at no junction did petitioners disclose that they had some of those checks available until shortly before the commencement of the trial in this case. Apparently petitioners had some of the returned checks drawn on the account. In any event, petitioners certainly would have been in a much better position to show the purpose of each of these checks than respondent's agents would have been to speculate on the purpose for which each check was drawn. If petitioners had available at the time of trial any checks drawn on the Crocker Citizens Bank other than the three drawn in repayment of loans to finance letters of credit, they *238 did not produce them. However, as heretofore stated, we do consider the evidence as a whole sufficient to show a reasonable approximation of the amount of machinery cost which came from deposits in the partnership account at the Crocker Citizens Bank. Mr. and Mrs. Lengyel did not strongly contest the determination of partnership income by respondent for the years 1965 and 1966 except to argue that some portion of the amount of partnership income withheld in cash by Mr. Lengyel and Mr. Feuer was used for business purposes. Mr. Lengyel testified that some of this cash was used for "under-the-table" payments or bribes to purchasing agents of companies or individual customers of the partnership in order to persuade them to purchase machinery from the partnership. On being pressed, he stated that he was unable to say how much cash was used for this purpose but he estimated that over the 3-year period not more than $ 10,000 was used in this manner. Considering the evidence of the seller's market in machines during the period here involved, we do not consider the testimony of Mr. Lengyel in regard to the "under-the-table" payments worthy of belief. The record shows that during the *239 years here involved machinery was in short supply. The partnership was able to mark up its new machines in an amount much greater than the amount recommended by the manufacturer. It would have been to the advantage of the partnership to be able to show the manufacturer a lower markup. Mr. Lengyel was very unsure of the extent of any so-called "under-the-table" payments or bribes made by the partnership. If in fact any such payments were made, the amount thereof must have been deminimis or Mr. Lengyel would have had a better recollection of the amounts of such payments and to whom the payments were made. In his testimony he did not point to any one specific instance in which such "under-the-table" payments were made. It is questionable whether any such payments would be deductible if made. See United Draperies, Inc. v. Commissioner,41 T.C. 457 (1964). However, on the basis of this record we conclude that none were made. Mr. Lengyel testified that at times he and Mr. Feuer would use cash to furnish to a prospective purchaser who would put the cash in his bank account in order to be able to state to a lending agency that he could make a downpayment *240 on the machinery he wanted to purchase with financing. Mr. Lengyel stated that after obtaining financing the purchaser would return the sum advanced to the partnership. Mr. Lengyel gave as an example a prospective purchaser of a $ 2,000 machine who was unable to make any downpayment. Mr. Lengyel stated that he and Mr. Feuer would write one invoice, listing the machines at $ 2,500 and give the prospective purchaser $ 500 in cash which the prospective purchaser would deposit in his bank account. The prospective purchaser would draw a check for $ 500 to the partnership. The prospective purchaser would then take his contract to purchase to a bank or finance company and obtain $ 2,000 of financing on the representation that he had made a $ 500 downpayment on the machine by check. The partnership would then make out another invoice for the proper amount of $ 2,000 and retain the $ 500 check. Mr. Lengyel could not estimate how often the partnership entered into this devious plan to assist a prospective customer in obtaining 100 percent financing of a machine or how much cash would be involved. Also, there is no showing in this record that to whatever extent, if any, this was done the *241 amount returned to the partnership or to Mr. Feuer and Mr. Lengyel ever found its way into the cash withheld from partnership sales as determined by respondent. We do not find Mr. Lengyel's testimony in respect to the cash advances to customers credible. On the basis of this record we conclude that no adjustment of income of the partnership as determined by respondent is necessary to account for advances by Mr. Lengyel and Mr. Feuer to prospective customers to assist them in obtaining financing. The third claimed usage of some of the cash withheld made by Mr. Lengyel was as a protection against situations where Mr. Lengyel and Mr. Feuer guaranteed the notes of a purchaser at the bank. Mr. Lengyel testified that had the purchaser defaulted on the note the partnership might have been required to pay the bank and repossess the machine which had been financed and sell it again. Mr. Lengyel testified that some few repossessions occurred, but never stated that when this happened the partnership sold the machine for less than the balance due on the note plus costs of repossessing the machine. In fact, it appears that the partnership could have made money on the repossessions. Mr. *242 and Mrs. Feuer argue that the partnership income as determined by the respondent was overstated in every year here in issue. However, for the years 1965 and 1966 they relied solely on the testimony of Mr. Lengyel, which we have previously discussed. On the basis of this record, we sustain respondent's determination for the years 1965 and 1966 except to the extent of the reduction in 1965 of partnership income necessitated by the $ 438 deposit of currency in the partnership account in 1965 which was not eliminated from respondent's determination of cash withheld by Mr. Feuer and Mr. Lengyel in respondent's determination of partnership income. Mr. and Mrs. Lengyel take the position that the deposits in the Crocker Citizens Bank were of a separate business of Mr. Feuer and not funds any portion of which should be chargeable to Mr. Lengyel. The basis for this argument is that Mr. Lengyel and Mr. Feuer broke up their partnership about the middle of March of 1967 and even though the Crocker Citizens Bank account was in the partnership name it was actually a bank account of a separate business of Mr. Feuer. Both respondent and Mr. and Mrs. Feuer take the position that the funds in the *243 Crocker Citizens Bank were partnership funds and any portion that represented unreported income is allocable one-half to Mr. Lengyel and one-half to Mr. Feuer. Respondent and the Feuers point to the provision of section 708(b)(1)(A) [7] that a partnership shall be considered as terminated only if no part of any business, financial operation, or venture of the partnership continues to be carried on by its partners in a partnership. They argue that since Mr. Lengyel admittedly continued working at the partnership location on South Santa Fe Avenue in order to sell the inventory that was located at that location and to receive and sell the machines which were on order that had not yet arrived, the partnership was clearly not terminated until September 12, 1967. Respondent and the Feuers also call attention to the fact that the 1967 return signed on behalf of the partnership by Mr. Lengyel stated that the partnership was dissolved on September 12, 1967, and listed Mr. Lengyel and Mr. Feuer as equal partners, each of whom devoted full time to the partnership business. *244 The Lengyels recognize that under the provision of section 708(b)(1)(A) the partnership was not terminated until September 12, 1967, but argue that the partnership did reach a point of dissolution prior to that time. They point out that under the Uniform Partnership Act adopted in California and certain California cases, dissolution of a partnership may occur by the express will of any partner or the withdrawal of a partner. They state that under the provisions of sections 15029, 15030 and 15031, California Corporations Code (West 1977), [8] the dissolution of a partnership is the change in the relation of a partnership caused by any partner ceasing his association in the carrying on of a business as distinguished from the winding up of the business. The Lengyels state that on dissolution a California partnership is not terminated but continues until the winding up of the partnership affairs are completed. Section 10530, California Corporate Code. They cite a number of California cases interpreting these provisions of the Code under varying circumstances. Some of these cases hold that one partner is not bound by certain acts of another partner after the dissolution of the partnership *245 even though a final settlement of the partnership accounts has not been made so that the partnership is terminated. See Credit Bureau of San Diego v. Beach,144 Cal. App. 2d 439, 301 P. 2d 87 (1956). However, the California cases are clear that "dissolution" under California law of a partnership operates only with respect to future transactions, and the partnership continues until all preexisting matters are terminated. Sausser v. Barrack,123 C.A. 2d Supp. 948, 266 P. 2d 231 (1954). *246 In our view the facts here do not show a dissolution of the partnership between Mr. Lengyel and Mr. Feuer under California law as of the middle of March 1967 as distinguished from discussions between them of possible future dissolution. Standing against the self-serving testimony of Mr. Lengyel is the fact that he did in fact sign the bank account card opening the partnership account at Crocker Citizens Bank after the claimed dissolution, that he must have known of orders of machines in the partnership name after that date, and that he signed the tax return stating that dissolution of the partnership occurred on September 12, 1967, and that he and Mr. Feuer were equal partners each devoting full time to the partnership business. Mr. Lengyel testified that he and Mr. Feuer parted ways and dissolved their partnership because he could not get Mr. Feuer to agree to stop withholding cash from checks drawn to the partnership in payment for machinery when those checks were deposited in the partnership bank account. However, the record shows that the partnership had moved its account from the Valley National Bank to the Vernon Branch of the Bank of America when the Valley National Bank *247 would no longer tolerate this practice and had moved the account from the Vernon Branch of the Bank of America to the Bell Branch when the officials of the Vernon Branch objected to this practice. After moving the account to the Bell Branch of the Bank of America, the practice stopped and we conclude that the partnership account at the Crocker Citizens Bank was opened to receive partnership receipts which the partners siphoned off for their own use. From the evidence as a whole we conclude that the discussion in March of 1967 was the possible future dissolution of the partnership if the Induma distributorship was lost and not a dissolution of the partnership under California law. However, even if there was a California dissolution of the partnership in March of 1967, the facts here do not show that the deposits in the Crocker Citizens partnership bank account were not of funds received in termination of the business of the partnership rather than from transactions initiated after that dissolution. Mr. Lengyel concedes that the inventory of the partnership and machines on order prior to the middle of March 1967 which were not received until later in the year, some of them being *248 received as late as June 1967, were not all disposed of until September 12, 1967. Mr. Lengyel also concedes that sales of the machines in inventory at the middle of March 1967 and machines on order at that time were in fact partnership sales. The record shows that portions of the sales receipts from these partnership machines were deposited to the partnership account at Crocker Citizens Bank. Nothing in this record shows that any uneliminated deposits to that account were not in fact of receipts of the partnership from the sale of partnership machines. Mr. Lengyel did testify that certain machines ordered after the middle of March 1967 which were paid for by checks drawn on the Crocker Citizens Bank were machines that were ordered by Mr. Feuer for his personal business and were not partnership machines. The record shows that these machines were paid for by checks drawn on the partnership account in the Crocker Citizens Bank. However, there is nothing in this record to show when these machines were sold or where the sales receipts were deposited. Mr. Lengyel testified that Mr. Feuer was handling most matters connected with the partnership account at the Bank of America, Bell Branch, *249 as well as at the Crocker Citizens Bank. For all this record shows, if the new Induma machines ordered in the name of and paid for by letter of credit granted to the partnership after the middle of March 1967 were sold before September 12, 1967, the proceeds from the sales could have been part of the deposits in the partnership account at the Bank of America, Bell Branch. Receipts of only $ 312,654.68 were deposited in the Bank of America partnership accounts in 1967. As will be hereinafter discussed, it is clear from substantial evidence in the record that this amount plus the $ 2,605 unreported and $ 15,805.40 of net cash withheld in 1967 is far from all the receipts from sales of machines which cost the partnership $ 270,481.34. If the partnership had receipts of only $ 331,065.08 on costs of $ 270,481.34, its gross profit percentage would be only about 19 percent, far less than the evidence as a whole indicates the partnership's profit percentage to be.It is therefore clear that a large portion of partnership receipts were deposited in the partnership account at the Crocker Citizens Bank.While Mr. Lengyel did not specifically testify to the contrary, the inference from the *250 argument made by the Lengyels is that a large portion of the deposits in the Crocker Citizens account of the partnership in 1967 were funds of Mr. Feuer personally and not of the partnership.In our view if this had been a fact Mr. Lengyel would not have signed a 1967 partnership return showing himself and Mr. Feuer as equal partners and certainly would have correctly disclosed his own 1967 income in his joint return which he signed in April 1968 after the investigation of the partnership return had begun. Weighing all the evidence, we conclude that the Crocker Citizens Bank account was a partnership account in fact as well as in form and that the funds deposited therein were partnership funds with the exception of $ 7,000 of funds of Mr. Feuer deposited therein which were eliminated from the deposits in respondent's computation. Not only is there direct evidence of this fact because of Mr. Lengyel's participation in opening the account and the tracing of some deposits of admittedly partnership funds into the account, but also the record has many indications that Mr. Lengyel must have received substantial portions of the funds deposited in this account for his own use. We have *251 pointed out in the facts purchases made by Mr. Lengyel in 1967 and deposits made by him in his own bank account in that year, as well as the fact that he opened his own business in that year which required the use of substantial funds. While Mr. Lengyel has admitted receipt of unreported cash in the two prior years and a small amount in 1967, from our recitation of the facts the usage by him of cash appears to be in excess of the amounts of his admittedly available cash. Also, we cannot ignore the fact that when Mr. Lengyel and Mr. Feuer were sued with respect to collection of unpaid rent on the partnership lease for part of the year 1967 and the first part of 1968 they each paid $ 2,000 in settlement of the suit. Mr. Lengyel testified that he did not have the $ 15,000 in the fall of 1965 to purchase the Aaron inventory on his own and that, although the partnership agreement had a buy-sell provision, he did not have the funds in the middle of March 1967 to buy out Mr. Feuer's interest in the partnership. The indication from the record is that Mr. Lengyel received substantial amounts of the funds deposited in the Crocker Citizens Bank account for his own use. From the evidence *252 as a whole we conclude that one-half of the net deposits in the Crocker Citizens Bank less partnership costs paid from that account represent income in 1967 of the Lengyels. All the petitioners contend that respondent included more of the amounts deposited in the Crocker Citizens Bank account as partnership income than in fact was income. They argue that many of the checks drawn on the Crocker Citizens Bank were for payment of expenses or for purchase of machines. Respondent on brief conceded that three checks totaling $ 69,367.49 drawn on the Crocker Citizens Bank account were for payments for machines. These checks were issued in repayment of loans made to Mr. Feuer or the partnership in connection with the obtaining of letters of credit which were drawn on in payment for machinery imported from Italy. Petitioners argue that many more of the checks were in payment for machinery or expenses. A review of the partnership returns discloses total claimed deductions for expenses for 5 months of operation in 1965 of $ 21,554.47. For the year 1966 total claimed deductible expenses were $ 57,289.30, and for approximately 8 months' operations in 1967 the total claimed deductible expenses *253 were $ 34,202.91. On a monthly basis this indicates expenses of approximately $ 4,300 a month in 1965, approximately $ 4,775 a month in 1966, and approximately $ 4,275 a month in 1967.Consdering the fact that Mr. Lengyel testified that because of winding up the affairs of the partnership the number of employees was reduced in 1967 to the point where in the last few months only one person was employed by the partnership, the 1967 expenses claimed on the partnership return are not out of line with the expenses for 1965 and 1966. We therefore conclude that the evidence indicates that all 1967 expenses of the partnership were claimed on the 1967 partnership return of income as filed irrespective of the bank account from which such expenses were paid. When the $ 15,805.40 of net cash withheld from partnership receipts in 1967 and the $ 2,605 of partnership receipts not deposited is added to the $ 287,090.92 which respondent determined to be partnership receipts not included in the partnership return from amounts deposited in the Crocker Citizens Bank account, the resultant total unreported income as determined by respondent for this year is $ 305,501.32. When this $ 305,501.32 is *254 added to the $ 312,654.68 of reported receipts, the total receipts of the partnership as determined by respondent is $ 618,156. Subtracting the $ 270,481.34 of cost of goods sold from this figure would result in a gross profit of $ 347,674.66, which would be a gross profit of over 55 percent. Even when the $ 69,367.49 which respondent concedes is a part of cost of goods sold is added to the $ 270,481.34 and the resultant figure subtracted from gross receipts of $ 618,156, a gross profit of $ 278,307.17 or approximately 45 percent results. This gross profit is higher than the record indicates the partnership obtained. The gross profit for the year 1965 when the unreported income of $ 10,829.17 is added to the reported receipts of $ 110,084.50 and cost of goods sold as reported of $ 66,393.21 subtracted therefrom is approximately 45 percent. When the unreported partnership receipts of $ 118,246.66 for 1966 is added to the reported receipts in 1966 of $ 420,283.82 and the reported $ 346,763.85 of cost of goods sold subtracted therefrom the resulting gross profit percentage is approximately 36 percent. There is testimony in the record of a used machinery dealer that although used *255 machinery could have a markup or profit percentage of from 1 to 200 percent, it generally in his experience was nearer to 35 percent. He testified that he thought the markup on new machinery was less than on used. Mr. Lengyel testified that the partnership planned to make approximately 50 percent gross profit on the used machinery purchased from Aaron and was not satisfied to sell the Induma machines purchased from Italy at the 22 percent markup suggested by the manufacturer. Apparently the profit percentage on the machines initially was between 40 and 50 percent depending on whether a machine that cost $ 1,700 or $ 1,800 was sold for $ 2,700 to an individual or $ 2,700 less 10 percent to a dealer. Later the profit percentage was greater when the price of the machines was increased. The indication from all this evidence is that some of the checks drawn on the Crocker Citizens Bank account, in addition to the $ 69,367.49 which respondent concedes, were for purchases of machinery sold by the partnership. In going over the statement from the Crocker Citizens Bank for the period March 20 through September 12, it is to be noted that many of the checks are for round amounts, an *256 indication that the check was drawn as a withdrawal and not for a payment of an expense. However, slightly over $ 56,000 in checks on this account in addition to the $ 69,367.49 during this period were in uneven amounts, an indication that these checks might have been in payment of expenses. If an additional $ 56,000 from the Crocker Citizens Bank account is considered to be a part of the partnership payment for machinery sold and therefore deductible from gross receipts, a much more realistic gross profit percentage results. Consdering the evidence as a whole, we conclude that instead of the $ 69,367.49 which respondent concedes to be a further deduction for cost of goods sold in 1967, this amount should be $ 126,000. If the $ 126,000 is added to the $ 270,481.34 reported cost of goods sold and the resulting $ 396,481.34 subtracted from the $ 618,156 of sales as redetermined by respondent, the resulting $ 221,674.66 is slightly less than the 36 percent gross profit which the partnership realized in 1966. We therefore conclude that of the deposits to the Crocker Citizens Bank account $ 126,000 represented payment for machinery purchased by the partnership for resale and that *257 the partnership income as determined by respondent for the year 1967 should be adjusted accordingly. In our view the record is clear and convincing that a part of the underpayment of tax resulting from the understatement of income on the separate return of Richard Feuer was due to fraud with intent to evade taxes. The record shows clearly that Mr. Feuer received one-half of the cash withheld from receipts of the partnership which were not reported by the partnership on its return and that he did not include any of this amount on his tax returns for 1965, 1966 and 1967. The record also shows that he deposited receipts of the partnership in joint accounts which he had with Mr. Lengyel and that none of these deposits were reported by him on his tax return, and that partnership receipts were deposited in the Crocker Citizens Bank account by Mr. Feuer and that none of these receipts were reported on his tax returns. This evidence in and of itself is clear and convincing evidence of fraud. Also, Mr. Feuer's participation in keeping a double set of invoices for the partnership, his refusal to turn over partnership books to the revenue agents, and his false replies and evasive answers *258 to the revenue agents' questions when the investigation of the partnership returns was begun, are additional evidence of fraud. O'Connor v. United States,175 F.2d 477 (9th Cir. 1949). On the basis of this record we conclude that respondent has sustained his burden of showing by clear and convincing evidence that part of the underpayment of tax by Mr. Feuer in each of the years here in issue was due to fraud and we therefore sustain his determination of an addition to tax for fraud under section 6653(b) with respect to Mr. Feuer's estate. There is very little evidence in the record bearing on the issue of whether a part of the underpayment of tax resulting from the understatement of income on the separate tax return of Mrs. Feuer for each of the years 1966 and 1967 was due to negligence or intentional disregard of rules and regulations. The burden to show error in respondent's determination in this respect is on the taxpayer. Pritchett v. Commissioner,63 T.C. 149, 174 (1974).The little evidence in the record with respect to Margaret Feuer's activities in fact support respondent's determination. She deposited some partnership checks received *259 in payment for machinery sold and withheld cash, and she cashed one partnership check for $ 3,500. Certainly she should have been aware when she filed her returns that she should have questioned whether these receipts were included in the partnership income reported on her separate returns. We therefore conclude that Mrs. Feuer is liable for the addition to tax under section 6653(a) for each of the years here in issue. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Margaret Feuer, docket No. 8367-75; and Daniel J. Lengyel and Lois M. Lengyel, docket No. 8368-75.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
3. Daniel J. and Lois M. Lengyel conceded at the trial that part of the understatement of tax resulting from the understatement of income on their joint Federal income tax return for each of the years 1965, 1966 and 1967 was due to fraud.↩
4. The cash withheld as shown in the notice of deficiency for 1965 is $ 3,788. However, the evidence shows that a currency redeposit of $ 438 was not eliminated from the cash withheld. On brief respondent conceded that in eliminating cash redeposited from cash withheld a $ 430 currency deposit had been overlooked. Since the only overlooked cash deposit shown by the evidence is $ 438, we assume respondent's concession has reference to the $ 438 item. ↩
5. In 1965 total cash was withheld from checks deposited in the account of $ 4,278, but cash in the amounts of $ 490 and $ 438 was deposited to the account leaving net cash withheld of $ 3,350. During 1966 cash was withheld from the partnership checks deposited in an amount totaling $ 135,621.45 and currency was deposited into the partnership account totaling $ 33,406.54, leaving net cash withheld of $ 102,214.91. In 1967 cash was withheld from the partnership checks deposited in the accounts furnished Mr. Anderson of $ 16,759.73 and cash was deposited in these accounts in the total amount of $ 954.33, leaving net cash withheld of $ 15,805.40.↩
1. Cost of goods sold was computed as follows: ↩
July 27 to
Jan. 1 to
Jan. 1 to
Dec. 31, 1965
Dec. 31, 1966
Sept. 12, 1967
Opening Inventory
$ 0
$ 123,105.98
$ 78,334.78
Purchases
189,499.19
301,992.65
192,146.56
Closing Inventory
123,105.98
78,334.78
0
6. The record shows that the 1967 partnership return was signed by Mr. Anderson under date of January 8, 1968, and by Mr. Lengyel under date of January 10, 1968, but does not show its filing date.↩
7. SEC. 708. CONTINUATION OF PARTNERSHIP. * * *
(b) Termination.-- (1) General rule.--For purposes of subsection (a), a partnership shall be considered as terminated only if-- (A) no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership, * * *↩
8. California Corporations Code (West 1977) Sec. 15029. Dissolution defined The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business. Sec. 15030. Effect of dissolution On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed. Sec. 15031. Causes of dissolution Dissolution is caused: (1) Without violation of the agreement between the partners, * * *
(b) By the express will of any partner when no definite term or particular undertaking is specified, (c) By the express will of all the partners who have not assigned their interests or suffered them to be charged for their separate debts, either before or after the termination of any specified term or particular undertaking, * * *
(7) By withdrawal of a partner or admission of a new partner unless otherwise provided in an agreement in writing signed by all of the partners, including any such withdrawing partner or any such newly admitted partner, before such withdrawal or admission; provided that in the case of a newly admitted partner he may become a party to any such pre-existing agreement by signing the same upon such admission.↩